# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

UNITED STATES OF AMERICA  )
  )
v.  )
  )   Case No. CR414-005
LILLIE MAE EUBANK  )

## REPORT AND RECOMMENDATION

Defendant Lillie Eubank seeks to suppress the statements she made during four separate interviews conducted by agents investigating the murder of her husband on the Fort Stewart military reservation. Although the agents assured her during the first three interviews that she was free to leave, and although she was in fact allowed to depart at the end of each of those interviews, Eubank nonetheless contends that her statements are inadmissible because the agents failed to administer the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Eubank concedes that *Miranda* warnings were given prior to her fourth interview but suggests that the interview was the unlawful product of the prior illegality. She further claims that her statements during each

of the four interviews were rendered involuntary by the abusive behavior of the interrogating agents.

The Court concludes that while elements of the first interview[1] are problematical due to the conduct of an Army investigator, Eubank has not shown that she was subjected to custodial interrogation until the fourth and final interview, when *Miranda* warnings were provided prior to any questioning. It further concludes that the evidence fails to support Eubank's claim that her statements were involuntary. Accordingly, her motion to suppress should be **DENIED**.

## DISCUSSION

Each of Eubank's interviews was conducted at the offices of the Army Criminal Investigation Division ("CID") on Fort Stewart, Georgia,

---

[1] In her initial briefs, Eubank did not challenge the validity of her first interview, conducted by an Army investigator on December 1, 2013, but attacked only the interviews conducted by FBI agents on December 2, 2013 and February 26 and 28, 2014. Doc. 159 (Eubank's mot. to suppress at 3-8, which discusses only the FBI interviews); doc. 198 (noting that "[t]his motion is directed at the statements of December 2, 1013[sic], February 26, 2014, and February 28, 2014); doc. 187 (referencing only the FBI interview of December 2, 2013). At the evidentiary hearing, however, the Court afforded Eubank an opportunity for additional briefing and invited her counsel to further review the recording of the interview conducted on December 1, 2013. Eubank's post-hearing brief now specifically contends that she was entitled to *Miranda* warnings during this initial interview and that her statements were coerced. Thus, the Court must assess the admissibility of Eubank's statements during all four interviews.

where she agreed to come at the invitation of either CID or FBI agents. Portions of the first interview, conducted solely by a CID agent, and all of the third interview, conducted by two FBI agents, were video recorded using camera equipment installed in the CID interview room. The other two interviews were not recorded pursuant to instructions of the FBI agents who questioned Eubank on those occasions.

### 1. December 1, 2013 interview

At around 5:00 p.m. on November 30, 2013, individuals visiting a recreational area near Holbrook Pond on Fort Stewart discovered a man suffering from severe head trauma. The victim, later identified as Army Specialist John Eubank,[2] died of his wounds shortly thereafter. Transcript of Evidentiary Hearing (doc. 244, hereinafter "Tr.") at 6. Army CID agents immediately commenced a murder investigation.

The next day, sometime before noon, defendant Eubank called her husband's military unit to report that he had been missing since around 4:30 p.m. the previous day. *Id.* CID Special Agent Nicole Cicero, who was leading the murder investigation of the still unidentified victim, called Eubank and asked if she was willing to come to the CID office for

---

[2] The victim was so disfigured from repeated blows to his head by a blunt instrument that he could not be identified until the following day.

questioning about her missing person report. Tr. at 7, 29. When Eubank explained that she was reluctant to drive herself because she did not know where the office was located, Agent Cicero arranged for a member of Spc. Eubank's unit to drive her to the facility. *Id*. at 7.

Eubank arrived at the CID office at around 1:15 to 1:30 p.m. on December 1. *Id*. Agent Cicero met Eubank in the parking lot, escorted her inside the office to an interview room, and offered her food, drink, and cigarettes. *Id*. at 8. The agent had Eubank provide a narrative account of when and where she had last seen her husband, helped her draft a sketch of the Holbrook Pond area reflecting those details, and sought and obtained Eubank's consent to look at her cell phone in order to establish a precise timeline of the events. *Id*. at 8-15; Gov't Exs. 6 & 7 (sketch and consent to search phone).

Not long after the interview commenced, members of Spc. Eubank's unit identified his body at the hospital where he had died. *Id*. at 14 (identification made at approximately 1:45 p.m.). At around 3:00 p.m., Army "Casualty Assistance" personnel -- who provide counseling and other services to the families of deceased servicemembers -- interrupted the interview in order to notify Eubank that her husband

was deceased. An Army chaplin as well as members of Spc. Eubank's unit then met with Eubank during the next three to four hours, offering consolation and assistance to a person whom they believed to be in state of shock and grief. *Id.* at 19-20, 42-43. Agent Cicero did not recommence her interview of Eubank until around 6:57 p.m. *Id.* at 19.

During the four-hour interval while Eubank met with Casualty Assistance, Agent Cicero prepared an affidavit for warrants to search Eubank's residence, Dodge Ram truck, and cell phone. Gov't Exs. 8-11 (introduced at evidentiary hearing). As the initial interview proceeded, Cicero had formed some suspicions about certain aspects of Eubank's account of the events. Although Eubank had stated that her husband was alone while looking for animal tracks in the woods near Holbrook Pond, text messages on her phone reflected such comments as "where are you guys," and the response "we're over here." Tr. at 15; Gov't Ex. 8 (warrant aff.). When asked about the use of the plural, Eubank explained, unconvincingly, that Spc. Eubank was referring to himself and "the animals." Tr. at 19 (noting that Eubank sometimes used the plural during the interview when referring to her husband's presence in the woods). Cicero also learned from other investigators, who had spoken

with Eubank's neighbors, that she had taken her brother to the bus station on the afternoon of the murder and that he had "left with a black bag." Gov't Ex. 8 at 2. Eubank had neglected to mention this information during her initial interview. Agent Cicero included these facts and other information developed by the investigators in her warrant affidavit. *Id.* at 1-2. The requested search warrants were issued by a military judge on Fort Stewart that same day. Gov't Exs. 9-11.

Given her suspicions, Agent Cicero elected to video record the second portion of the interview, which commenced around 7:00 p.m. and continued until approximately 12:30 a.m. on December 2.[3] Gov't Ex. 2. From the outset of the recorded portion of the interview, Eubank knew that other investigators were then present at her on-post residence to conduct a search, and she relinquished her keys to facilitate their gaining entry to her home and pickup. *Id.*, Clip 1. Agent Cicero told Eubank that she "obviously" had a right to be present at the property while the search proceeded. *Id.* The agent then emphasized that Eubank was free to leave and could discontinue the interview at any time: "[B]efore we

---

[3] The initial portion of the December 1 interview, which lasted from Eubank's arrival until around 3:00 p.m., was not recorded, apparently because she was not then under suspicion.

get started, I want you to know that you are free to go. Ok?" Doc. 255 at 7 (quoting Gov't Ex. 2, Clip 2, 30:15-30:32). Although Eubank acknowledged her understanding of that statement, the agent continued: "I know . . . you're kind of restricted 'cause you don't have a vehicle, but . . . its an open office;" Eubank could stop the interview by simply saying "I'm done; I don't want to talk to you anymore." *Id.*

On numerous occasions during the recorded interview, Eubank accepted the agent's offer to step outside the CID office for a smoke break (for smoking was not permitted inside the building). *Id.*, Clips 1-3, 7; tr. at 20. Eubank is a chain smoker, and some of the breaks lasted for more than half an hour. Gov't Ex. 2, Clips 1-2, 3; tr. at 21. Eubank took these breaks in an unrestricted area where there was a picnic table, and on occasion she was outside by herself. Tr. at 22. During the entirety of the interview, a Casualty Assistance official was on standby to give her a ride when she was ready to leave. *Id.* at 23, 27.

Early in the recorded portion of the interview, Eubank expressed concern about her dogs and indicated that they might bite anyone who came inside her home. Gov't Ex. 2, Clip 1. Agent Cicero asked about the dogs' names and food requirements and indicated they would be fed by

agents at her residence. *Id.* At one point after a smoke break, Eubank mentioned that she took insulin and needed to eat when her blood sugar dropped. *Id.*, Clip 2. Eubank, however, never accepted the agent's offer of food, although the video reflects that she did occasionally sip from some type of canned beverage. *Id.*, Clips 3-5. She declined bottled water because CID did not have her particular brand (Dasani). *Id.*, Clip 2. Later during the interview, Eubank described the medication she was taking and where it might be found in her home. *Id.*, Clip 7. When those medications were brought to the CID office, they were offered to Eubank but she declined to take them. Tr. at 26-27.

As the interview progressed Agent Cicero began to express doubts about Eubank's earlier account of the events at Holbrook Pond. The agent particularly focused on Eubank's failure to mention that her brother, co-defendant Carl Swain, was visiting her from Alabama and departed on the afternoon of the murder. Gov't Ex. 2, Clips 2-3. When Cicero began to ask pointed questions about who else was with Spc. Eubank at Holbrook Pond, Eubank at first said she didn't know and indicated she wanted to go home. *Id.*, Clip 4. The agent responded that Eubank could leave but she could not go home because it was "being

secured." *Id.* When Eubank asked "[w]here am I supposed to go?",
Agent Cicero stated that her house could be released or that members of
her husband's unit could make other arrangements for her. *Id.*[4] Later,
Cicero again told Eubank that she was "free to go," but that if she went
to her house "right now" she could not enter because there were people
there investigating a crime scene. *Id.*

---

[4] The video recording reflects the following exchange:

> EUBANK:   I want to be there with my husband at the house.
> Please, let me go to the house.
>
> CICERO:   I can't let you to your house right now. I can let you
> leave, but right now I can't promise you you can
> get in your house.
>
> EUBANK:   Why?
>
> CICERO:   Because your house right now is being secured.
>
> EUBANK:   What do you mean?
>
> CICERO:   Meaning you can't – you don't have access to your
> house right now. You can leave if you want, but you
> don't have access to your house.
>
> EUBANK:   Where am I supposed to go?
>
> CICERO:   Your house could be released, or the unit will make
> other arrangements for you, ma'am. Right now,
> if you want to leave, you can go, but I can't
> promise you can get in your house.

Doc. 255 at 8 (quoting Gov't Ex. 2, Clip 4, 11:13-11:45).

On continued questioning, Eubank finally admitted that her brother had been at the pond "at one point." *Id.* She then related that when a pig had come out of the woods her husband ran away, at which time her brother clubbed the pig to death with a bat. *Id.*, Clips 2 & 6. Agent Cicero was dismissive of this story and indicated that Eubank was not telling the truth. *Id.*, Clip 4. Cicero then stated:

> You've been leaving Carl out all day Lillie which makes me believe you know more than you're telling me. You know what's going to happen . . . the shit is going to turn around on you instead of Carl who actually did it. So by you putting your ass out there, it's not, going to end well for you.

Doc. 255 at 14 (quoting Gov't Ex. 2, Clip 4). Despite the agent's confrontational tone and accusations that defendant knew more than she was saying, Eubank steadfastly denied any knowledge of who had murdered her husband. Eubank calmly insisted over and again that she was innocent of any wrongdoing, only occasionally showing any emotion at all. Gov't Ex. 2, Clips 4-7.

While some of the questioning after this point was polite and matter-of-fact, the agent increasingly grew frustrated with Eubank's responses and her refusal to acknowledge the inconsistencies in her story. At one point she picked up Eubank's cane (with her permission),

tossed onto the floor a notebook which she described to Eubank as "your freaking husband's face," and assuming the role of Eubank's "bad ass brother," the agent pretended to beat the notebook with the cane. *Id.*, Clip 6. Eubank remained impassive and apparently unfazed by these histrionics, insisting that she did not see what Swain was hitting and believed his story that it was a pig. *Id.* Upon continued questioning, Eubank's story began to shift and she eventually conceded a suspicion that Swain was responsible for her husband's death. *Id.* Eubank remained calm throughout the interview and exhibited no signs of mental confusion or physical distress. Indeed, toward the end of the interview Eubank agreed to make a pretextual call to Carl Swain, even offering ideas about what she should say to her brother. Tr. at 28; Gov't Ex. 2, Clip 7.

Eubank contends that while she was not formally arrested at any point during her December 1 interview, *Miranda* warnings were nevertheless required because she was subjected to a "'restraint on [her] freedom of movement of the degree associated with a formal arrest.'" Doc. 250 at 2 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Eubank acknowledges that she was told several times that she was free

to leave, but she contends that a reasonable person in her situation would have viewed those assurances as mere "lip service," doc. 250 at 4, and would not have felt free to terminate the interview and depart the CID office. Eubank emphasizes these factors in support of her claim: (1) she was questioned at the CID office, inside "a small closed interview room" and secured behind "at least one locked door which [she] did not have the means to unlock," *id.* at 5; (2) Agent Cicero often "crowd[ed]" her, "yelled and cursed repeatedly," and "fired stark accusatory" questions at her, *id.* at 6; (3) the "agents successfully isolated [her] from her family and loved ones," *id.* at 7; (4) she was without her vehicle, lacked the physical ability to leave without transportation, and did not know that she had a place to stay, *id.*; (5) she was exhausted and made clear to the agent that she needed sleep and wanted to leave, *id.*; and (6) she told the agent that she "was experiencing symptoms of her diabetes and needed her insulin." *Id.* at 12.

Some of these factual assertions are true, but some are not. Those that are true are troublesome enough and serve to distinguish the questioning of Eubank from the typical interrogation techniques encountered by this Court in other cases involving federal law

enforcement agents. But on balance, after considering all of the circumstances surrounding the December 1 interview, the Court is not persuaded by Eubank's argument that she was effectively "in custody" at any point during her questioning by Agent Cicero, or that her statements were the product of will-overbearing coercive tactics employed by that agent.

First, the factual errors. The record refutes Eubank's assertions that the agents effectively "isolated" her from her family behind a "locked door." Eubank initiated the contact with law enforcement by calling to report that her husband was missing. She then accepted Agent Cicero's *invitation* to come to the CID offices to provide a formal report; and because she did not know the way and preferred not to drive her own vehicle, she readily agreed to have a member of her husband's military unit transport her to the facility. Nor was she locked in the CID office or otherwise isolated from the outside world once she arrived there. While a key was needed to gain entry, no key was needed to *exit* the CID offices, and Eubank knew this, for she repeatedly exited the building through unlocked doors to take her extensive smoke breaks. Tr. at 30-31; *see id.* at 51. During some of those breaks she was totally alone and could have

walked away from the facility without anyone's knowledge. *Id.* at 22. Finally, for three to four hours the interview ceased while Eubank met with Casualty Assistance officials, including a chaplin, who were there to counsel and console her during this time of (feigned) bereavement. *Id.* at 38-39.

The record also fails to support Eubank's claim that she was in distress because of her diabetes and "needed her insulin." Early on in the interview Eubank said that she needed to eat when her blood sugar was low, but she refused the agent's offer of food (though she can be seen during the video drinking some unidentified canned beverage). Gov't Ex. 2, Clips 2, 3-5. Further, the agent not only inquired about Eubank's medications, she had those medications brought from her home to the CID office and made them available to Eubank. *Id.*, Clip 7. Eubank, however, declined to take any of her drugs.[5]

The evidence also fails to support Eubank's assertion that she

---

[5] On cross-examination defense counsel suggested that Eubank's insulin was not among the drugs brought to the CID office. Tr. at 33. The agent could not recall what medications were made available to Eubank. *Id.* There was, however, no testimony or evidence that insulin was *not* among the drugs offered to Eubank, and at no point during the recorded interview did she indicate that her insulin was missing or that she had a present need for that medication. Nor does Eubank ever exhibit any visible signs of shaking (as defense counsel suggested she might have done), disorientation, mental confusion, or an inability to focus and respond appropriately to questions put to her by the agent. Gov't Ex. 2, Clips 1-8.

lacked "the physical ability to leave without a vehicle, and, as far as she knew, a place to stay." Doc. 250 at 7. Again, Eubank chose to leave her vehicle at home and accept a ride to the CID office. Once there, no locked doors or physical restraints prevented her from leaving the facility. It is true that she has serious health problems and walks with a cane. But her physical inability to walk very far from the CID offices (assuming that to be the case) was not a restraint imposed by Agent Cicero, and there is no evidence that the agent invited Eubank to come to CID as a means of taking advantage of her disability.[6] From the outset of the recorded portion of the interview, Eubank knew that her residence was about to be searched, and she was initially told that she "obviously" had a right to be present while the search proceeded. Gov't Ex. 2, Clip 1. Only later, when Eubank indicated a desire to go home, did the agent state that Eubank could not enter her home while it was being searched. *Id.*, Clip 4. When Eubank asked "Where am I supposed to go," Agent Cicero explained "Your house could be released, or the unit will make other arrangements for you, ma'am." *Id.* So, contrary to Eubank's

---

[6] As the government correctly asserts, "Eubank could have left the CID building and sat outside, walked down the street, called a friend or family member, hailed a taxi, or engaged in any other activity enjoyed by those who are free to move about. But she never asked to do any of those things." Doc. 255 at 9-10.

assertion, she did have knowledge that she would have a place to stay once she departed the CID offices.

Eubank correctly asserts that at times during the recorded interview, particularly when pointing out holes and inconsistencies in her account of the events, Agent Cicero would bring her chair up close to Eubank's, "crowding her and invading her personal space." Doc. 250 at 6. It is also true that on occasion the agent shouted out questions, cursed, and became physically animated (gesticulating and moving about the interview room). This overly dramatic behavior was not only unprofessional under the circumstances, it was ineffective, for Eubank persisted in her story -- unbelievable as it was -- that she had no knowledge of how the murder occurred.[7]

---

[7] The Court is well aware that interrogating agents sometimes raise their voices, become impatient, and resort to coarse language when they believe the interviewee is withholding pertinent information or lying. Agent Cicero, however, stepped outside the bounds of propriety by such statements as these: (1) "why didn't you mention Carl before, Lillie, because you fucking knew he killed your husband;" (2) "you're selling me a freaking bag of shit;" and (3) "you got your bad ass brother out there beating the shit out of him in the middle of the day out in the woods and you don't pay it any fucking mind." Doc. 250-1 at 5, 6, 8 (quoting Gov't Ex. 2 at Clips 5 & 6). Of course, some suspects customarily speak that way themselves, and an agent confronted with such language may tend follow suit and lapse into the vernacular of the person being interviewed. But the use of such vulgar language was inappropriate here, for Eubank did not use it when addressing the agent. (Her single use of the word "shit" followed on the heels of the agent's own use of the term "freaking bag of shit.") Agent Cicero's foul mouth and juvenile behavior was uncalled for (and atypical in the Court's experience with federal agents). And by becoming loud and

Eubank is further correct that, as the interview continued late into the evening, she stated at various points that she needed sleep, was "exhausted" and "sick of sitting up here," and wanted to go home. Gov't Ex. 2, Clips 3, 4. Eubank suggests that, despite these requests, the agent told her that she could not go to her residence. Again, that statement must be viewed in the light of the agent's *repeated* assurances that defendant was free to terminate the interview and leave at any time, and that she was being denied access to her home only until the investigators completed their search of the premises. Gov't Ex. 2, Clips 2, 4. Despite that repeated advice, Eubank never exercised her right to leave or to refuse to answer any more questions.

The police are required to administer *Miranda* warnings only when conducting a "custodial interrogation." *Miranda*, 384 U.S. at 444; *id.* at 467 (extraordinary procedural safeguards are required when an individual is subjected to the "inherently compelling pressures" of "incustody interrogation," pressures which work to induce a suspect to incriminate himself). It is not enough that the questioning takes place in

---

overwrought herself, Cicero missed many opportunities to ask appropriate follow-up questions, and then *wait for them to be answered.* Apparently, Cicero has spent too much time watching cable television cop shows and harbors the belief that her antics in this case are an effective means of interrogation. As the video establishes, they are not, at least with respect to a suspect as composed and calculating as Eubank.

17

a "'coercive environment,'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977), or that suspicion has focused on the person being questioned. *Id.*; *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984). Nor are warnings required where an individual has been temporarily seized short of an arrest, such as during a routine traffic stop, *Berkemer v. McCarty*, 468 U.S. 420, 441-42 (1984), or an investigative detention pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). Rather, for *Miranda* protections to apply the person questioned must be subjected to either "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1124-25 (*quoting Mathiason*, 429 U.S. at 495). The test is an objective one: taking into account all the circumstances surrounding the interrogation, would a reasonable person -- one innocent of any wrongdoing -- have felt that he was not free to terminate the interview and leave. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006); *United States v. Muggee*, 225 F.3d 1267, 1270 (11th Cir. 2000).

Various factors have been identified as particularly relevant when assessing how a reasonable person would have understood his situation at the time of questioning: the location and duration of the

interrogation; the application of any physical restraints; the tone of the questioning; statements conveying the impression that the interviewee is under suspicion; assurances that he is not under arrest; and the interviewee's release at the end of questioning. *See Howes v. Fields*, 132 S. Ct. 1181, 1189 (1012); *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010). This case, like many others, has features that cut both for and against a finding of custody. *See, e.g., Howes*, 132 U.S. at 1192-93; *Yarborough v. Alvarado*, 541 U.S. 652, 664-65 (2004); *Burch v. Secretary*, 535 F. App'x 789, 793 (11th Cir. 2013) (unpublished). Eubank was interviewed at the CID offices, the classic "police-dominated atmosphere." *Miranda*, 384 U.S. at 445, 456. She remained there for some 11 hours, and regardless of the exact length of her interrogation (for she was not questioned about the murder for all of this time), her questioning certainly cannot be described as brief. *Yarborough*, 541 U.S. at 665 (distinguishing the 2-hour interview in that case from the 30-minute interview in *Mathiason*). And for a portion of the interrogation, the agent adopted a confrontational tone and employed a highly aggressive manner of questioning. While Cicero never accused Eubank of murdering her husband, she stated that she was withholding

information and covering for her brother, Carl Swain.

The Court is persuaded, however, that the totality of the features and circumstances of the interrogation weigh against a finding that Eubank was "in custody" for *Miranda* purposes. This case does not involve "the paradigmatic *Miranda* situation," as Eubank was not "yanked from [her] familiar surroundings" and forcibly brought to the CID office. *Howes*, 132 S. Ct. at 1190, 1191. Instead, she initiated the police contact herself, and she came to the CID office voluntarily. Upon her arrival there, she was not arrested, handcuffed, or restrained in any manner. Once her husband was identified as the murder victim, a chaplin and other support personnel counseled with her for an extended period. When the interview (now a murder investigation) recommenced, the agent emphasized in very clear terms that Eubank was *not* in custody and that she could terminate the interview at any time. Even after confronting Eubank with the obvious inconsistencies and flaws in her story and accusing her of withholding information about Carl Swain's involvement in the murder of her husband, the agent continued to remind Eubank that she was free to leave.

"Unambiguously advising a defendant that he is free to leave and is

not in custody is a powerful factor in the mix, and generally will lead to the conclusion the defendant is *not* in custody, absent a finding of restraints that are 'so extensive that telling the suspect that he was free to leave could not cure the custodial aspects of the interview.'" *Brown*, 441 F.3d at 1347 (emphasis in original) (*quoting Muggee*, 225 F.3d at 1271); *see Howes*, 132 S. Ct. at 1192-93 (deputies' use of "'a very sharp tone'" and occasional profanity while conducting a 5 to 7-hour interrogation of prisoner, factors which tended to support a finding of custody, was "offset" by fact that prisoner was told several times that he could leave and return to his cell whenever he wanted, and by the lack of any physical restraints or threats by deputies); *Burch*, 535 F. App'x at 793-94 (state habeas court reasonably found defendant's interrogation was noncustodial despite "differing indications" of his status). The agent's repeated advice that Eubank was free to leave was not mere "lip service," for she imposed no restraints whatsoever -- much less any "extensive" restraints -- on Eubank's liberty. To the contrary, she allowed Eubank to take lengthy smoke breaks in an unrestricted outdoor area where no impediment prevented her from departing the premises. None of the cases cited by Eubank in her brief involve a defendant who

enjoyed such freedom in the course of an interrogation.[8] Eubank was not confined, as any reasonable person in her position would have readily perceived.

Viewing the totality of the circumstances surrounding the interrogation, the Court finds that Eubank was never subjected to such extensive restraints on her freedom of movement as to nullify the agent's repeated assurances that she was free to terminate the interview and depart the CID office. As Eubank was not in custody, the agent had no obligation to administer *Miranda* warnings during the December 1 interview.

The Court is further satisfied that, despite the length of the interrogation,[9] Eubank's poor health, and the aggressive nature of some

---

[8] Eubank cites cases where the police conduct effectively nullified their assurance that the suspect was free to leave. Doc. 159 at 8. As the government's discussion of those cases demonstrates, they each involved commands or displays of force on the part of law enforcement not present in this case. Doc. 174 at 25-34. The cases Eubank cites are factually distinguishable and do not support her argument that she was in custody.

[9] Eubank's counsel suggested that she was questioned "for quite a long period of time" (from 1:30 p.m. to 12:30 a.m.), tr. (doc. 244) at 31, but this is a mischaracterization. Eubank initially spent some 90 minutes relating information in support of her missing person report. Then, for the next 3 to 4 hours she met with Casualty Assistance personnel, who came to console her about the death of her husband. The recorded portion of the interview, which is when the true interrogation occurred, consumed some 4 hours and 33 minutes. Gov't Ex. 2, Clips 1-8. But less than two hours of that time involved actual questioning by Agent Cicero.

of the questioning, her statements were entirely voluntary. Eubank initiated the contact with Army law enforcement officials by reporting that her husband was missing. She freely accepted the agent's offer to come to the CID office and assist in the investigation of her complaint. She appeared there in the guise of the concerned spouse, and for the next one-and-a-half hours she furnished a concocted story of the events at Holbrook Pond. Then, when Casualty Assistance officers arrived to advise her husband had died, Eubank assumed the role of the grieving widow and accepted consolation from a chaplin and members of her husband's unit for three to four hours. When the interview recommenced, the agent made certain that Eubank understood that she was free to leave, and the agent at first asked matter-of-fact questions in a normal tone and listened respectfully to Eubank's answers. As Eubank's initial account of the events began to fall apart under close questioning, the agent became increasingly hostile and aggressive in an effort to secure an admission that Eubank was withholding information

---

The rest of the time Eubank is either out of the room for a smoke break (while the camera in the interview room continues to run), *id.*, Clips 1-3, or remains seated in the room while Cicero steps away. *Id.*, Clips 4, 5, 7. The record does not reflect how much time Eubank spent making an agent-controlled phone call to Carl Swain, *see id.*, Clip 8, but there is no contention that this involved a prolonged process. *See* doc. 174 at 9 (characterizing the phone call as "brief").

that implicated her brother, Carl Swain. Despite the agent's theatrical displays of exasperation over Eubank's answers, Eubank never faltered in her insistence that she had not tried to mislead the agent.

In assessing the voluntariness of a confession the court must determine whether any coercive tactics employed by the police were sufficient to overbear the defendant's will or critically impair his capacity for self-determination. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Colorado v. Spring*, 479 U.S. 564, 574 (1987). The question is not just whether the police used some form of coercion designed to extract a confession, but whether the coercive police conduct is "causally related to the confession." *Connelly*, 479 U.S. at 163-64; *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988) (the Constitution is infringed only where defendant's confession is motivated by a desire "to end police coercion"). Thus, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" 479 U.S. at 167. In determining whether defendant's will was overborne, the court must assess "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Because it is appropriate to consider the suspect's individual characteristics (e.g., age,

education, and intelligence), the test for voluntariness (unlike the *Miranda* custody test) involves a subjective inquiry. *Yarborough*, 541 U.S. at 667-68. But while a defendant's individual characteristics may suggest that he was especially susceptible to police coercion, or even that he lacked the volitional ability to make a free and rational choice, the defendant's confession is nevertheless voluntary unless the police exploit that susceptibility or mental weakness with coercive tactics. *Connelly*, 479 U.S. at 161-65; *id.* at 170 (the voluntariness inquiry "depend[s] on the absence of police overreaching, not on 'free choice' in any broader sense of the word"). *See McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (*Connelly* requires a 3-step test for voluntariness: (1) was the police activity objectively coercive; (2) was defendant subjectively susceptible to coercion, and (3) was the police misconduct the cause or "'crucial motivating factor'" of the confession).

There are coercive aspects to any police questioning of a citizen suspected of a crime, *Mathiason*, 429 U.S. at 495, and Agent Cicero certainly enhanced those coercive elements through her aggressive conduct during part of the interview (repeated accusations that Eubank was being deceptive, shouted-out questions, the use of curse words, and

dramatic displays of pique). Eubank, however, continued to calculate and deceive, never yielding to the agent's persistent efforts to gain a confession. Eubank remained outwardly calm, even impassive, during the agent's temper tantrum. While she adjusted her story as Cicero confronted her with new information discovered by the investigators, she refused to acknowledge that she had ever tried to mislead the agent. Eubank, who has some college education, provided clear and lucid responses to the agent's questions, and the record reflects that she has a good vocabulary and sophisticated language skills.[10] Gov't Ex. 2. Considering the entirety of the evidence, the Court finds that the government has met its burden of establishing by a preponderance of the evidence that Eubank's will was never overborne and that her statements were entirely voluntary.

## 2. December 2, 2013 interview

Eubank contends that the tactics employed by Agent Cicero on December 1 "pale in comparison to how [she] was treated when interviewed by a team of FBI agents the following day." Doc. 250 at 9;

---

[10] Eubank's verbal abilities and intelligence are further demonstrated by the handwritten statements she later furnished to FBI agents, statements which reflect excellent spelling, grammar, and narrative skills. Gov't Ex. 13 (Eubank's five-page statement of December 2, 2013); Gov't Ex. 19 (her one-page statement of February 26, 2014).

*id.* at 10 (Cicero's behavior was "not as severe as the conduct Mrs. Eubank was subjected to by the FBI on this December 2, 2013"). Eubank elected not to testify at the evidentiary hearing, and her characterization of the December 2, 2013 interview rests on the testimony of her daughter, Angel Wells, who was also interviewed that day. *Id.* at 54. Wells claimed that she could overhear two FBI agents yelling at her mother for hours. The Court found Wells to be an untrustworthy witness, and it credits instead the contrary testimony of the government's witnesses that Eubank was never mistreated during the December 2 interview.

FBI Agents Deanna Williams and Brad Snider conducted their initial interview of Eubank on the afternoon of December 2, 2013. Tr. (doc. 244 at 41-42, 44). Casualty Assistance personnel, who were providing Eubank with housing, transportation, and counseling during this period, brought Eubank and her daughter to the CID office from the on-post hotel where they were staying. *Id.* at 42-43, 52. Agents Williams and Snider spoke with Eubank while other agents interviewed Angel Wells. *Id.* at 54. Although CID recording equipment was available for the FBI agents' use in the interview room, the agents gave instructions

that the interview was not to be recorded,[11] although it was viewed over closed-circuit television within the CID office.

The FBI agents questioned Eubank at the CID office. Tr. at 44. The agents explained that they wanted to speak with Eubank about the death of her husband and informed her that "if she wanted to leave . . . she could leave." *Id*. Eubank agreed to speak with the agents. *Id*. at 45. They offered her food and water and said that she could take breaks if she wished to do so. *Id*. at 44.

At no point during the interview did the agents threaten Eubank, make her any promises, lock her in the facility,[12] handcuff or restrain her, curse, or fail to provide her with nourishment or requested breaks. *Id*. at 65, 66. During the course of the seven-and-a-half-hour interview, Eubank took a twenty-five minute break while she smoked three or four cigarettes in the unrestricted area outside the CID office. *Id*. at 50-53, 100. Because Eubank was upset when she first went outside, Agent

---

[11]  Agent Williams explained that, at that time, it was FBI policy not to record custodial interviews; in fact, the agents "had to go through a lot of layers of approval in order to do so." Tr. at 47, 81. Later (apparently in April 2014), FBI policy changed to require agents to record such interviews. *Id*. at 106.

[12]  The door to the interview room was closed but unlocked, and Eubank knew that no key was required to exit the CID building, for when she took a smoke break, she saw Agent Williams freely open the doors that led outside the building. Tr. at 46, 51.

Williams sat with her at a picnic table for a while. *Id.* at 51. During their conversation, Eubank pointed out the Casualty Assistance officer who was waiting to transport her once she completed the interview. *Id.* at 52. When the agent went back inside the building, she left Eubank alone and unsupervised, and she propped open the outside door so that Eubank could re-enter the facility when she finished smoking. *Id.*

Eubank received two calls on her TracFone[13] during the course of the interview, one from her mother and one from a counselor. *Id.* at 48-49; Gov't Ex. 16-A (reflecting incoming calls at 6:10 p.m. and 7:40 p.m.). The agents did not discourage Eubank from taking the calls, ask that they be allowed to listen to what the caller was saying, or demand that she hurry her conversation or discontinue the call. Tr. at 49-50. After the second call, Eubank chose to turn off her phone to prevent further interruptions. *Id.* at 50. Although Eubank had consented to an examination of her cell phone the previous day, the agents requested and obtained Eubank's permission to search that phone and download its contents. *Id.* at 60; Gov't Ex. 14 (consent form).

For the first couple of hours, the agents allowed Eubank to give a

---

[13] Army CID furnished this phone to Eubank on Dec. 1 after she allowed them to retain her cell phone for further examination  Tr. at 61.

narrative account of her marriage to Spc. Eubank and their activities during the Thanksgiving holiday just prior to his death. Tr. at 47. Eventually, however, the agents began to question Eubank about obvious "holes in [her] story," and they ultimately stated that they did not think she was being entirely truthful. *Id.* While the agents sometimes raised their voices when expressing their disbelief in the accuracy of her story, *id.* at 99-100, 109-110, they never screamed, yelled, or endeavored to physically intimidate Eubank during the interview. *Id.* at 66, 67, 110. At the end of the questioning, Eubank agreed to provide a handwritten statement memorializing her story, a task that took her some one-and-a-half to two hours. Tr. at 56-60; Gov't Ex. 13. Eubank asked Agent Williams to remain with her while she wrote her statement, and before she departed with the Casualty Assistance officer, she asked Williams for a hug. Tr. at 66.

Angel Wells, who was interviewed in a separate room by two male agents (never identified at the hearing), testified that she was treated "very poorly" by the agents, who yelled and screamed at her for almost the entire three to four-hour interview. *Id.* at 118. She stated that, during this time, she could hear agents across the hall yelling at her

mother and calling her a "monster." *Id.* at 119. She claimed that an agent grabbed her wrist to prevent her from leaving the interview room and forced her to provide a false statement. *Id.* at 121. She stated that her mother later told her that she had in fact been called a "monster" during her own interrogation and that one of the agents had placed his feet on the interview table in such a way that his service weapon, which was in an ankle holster, was pointed directly at her. *Id.*

The Court does not believe Angel Wells. Specifically, it rejects her testimony that she could hear agents "yelling" at her mother for many hours or that she ever heard them call her a "monster." The Court further rejects her hearsay statement that one of the agents pointed a gun at Eubank during the interview. The Court credits the testimony of Agent Williams that she and Agent Snider only occasionally raised their voices when questioning Eubank, and that they never yelled or screamed at her or called her a monster.[14]

---

[14] Agent Williams' characterization of the events was supported by the testimony of Army CID Special Agent Ricky Myrick, who watched portions of Eubank's December 2 interview on closed-circuit television. Tr. at 108. While Myrick only saw some 50 minutes of the interview, he did so in 10-minute intervals at random times during the questioning, whenever he could take a break from his other duties. *Id.* at 112. Myrick testified that the tone of voice during the questioning was "pretty moderate," though he conceded that the interviewing agents did raise their voices at times when they suspected that Eubank was not being truthful. *Id.* at 109-110. He never saw

31

Agent Williams provided this account of the gun incident: At one point during the interview, Eubank got out of her chair and sat on the floor. *Id.* at 53. When the agents did the same, Agent Brad Snider's pant leg came up, exposing his ankle holster. Eubank noticed it and asked what it was. When Snider explained that it was his duty weapon, Eubank requested that he not point it at her, even though the weapon was pointed at the wall and not in her direction. *Id.* at 53-54. But to reassure Eubank, Agent Snider removed his firearm and secured it inside a desk drawer in the interview room. *Id.* at 54. Eubank never mentioned it again.[15] The Court found Williams to be a trustworthy

---

the agents make any threats or promises to Eubank, and he never heard the agents scream or yell at her, call her a monster, or point a gun at her. *Id.* at 110-111.

[15] Eubank points out that during the later recorded interview conducted by the FBI on February 26, 2014, she commented that Agent Snider "scared the hell out of [her]" on December 2. Tr. at 104. Agent Williams testified that she did not know that Eubank was ever scared, but she conceded that the agents asked no follow-up questions when Eubank made this comment. *Id.* Eubank elected not to testify at the hearing, and she never explained the meaning of her February 26 comment. But her conduct and behavior after the December 2 interview contradicts her claim that she had a deep fear of either agent. For several months following that interview, Eubank repeatedly called Agent Williams on her cell phone and had many calm and friendly conversations with her. Tr. at 70. Eubank clearly had a special fondness for Agent Williams, but she never told Williams that she was afraid of Agent Snider. *Id.* at 71. Indeed, when Agents Williams and Snider delivered a grand jury target letter to Eubank on December 10, 2013, *id.* at 73, she accepted their offer to transport her to Savannah for her scheduled appearance before the grand jury on December 12. *Id.* at 74. During that trip, Eubank exhibited no fear of Agent Snider, *id.* at 75, and in fact she engaged him in conversation about their common interest in fishing. *Id.* at 76. Whatever Eubank meant by her February 26 comment, the credible evidence

witness and credits her version of these events.

Eubank has failed to meet her burden of establishing that, despite the agents' assurances to the contrary, she was effectively "in custody" during her December 2 interview. The evidence does not support her assertion that the agents ever tried to intimidate or restrain her during that interview. While the agents did ask hard questions and raised their voices on occasion when expressing doubt about the truthfulness of her answers, they never abused Eubank in the manner described by Wells or gave any her any cause to believe that they had revoked their initial assurance that she was free to leave. Because it was clear to a reasonable person in Eubank's position that the interview was not custodial in nature, *Miranda* warnings were not required.

The government has further established by a preponderance of the evidence that Eubank's statements were entirely voluntary and not the result of coercion by the FBI agents. At no point did the agents attempt to overbear Eubank's will by any overt or implied threats of harm or promises designed to induce a confession. The Court finds that

---

does not support a finding that either agent intentionally frightened her on December 2, 2013, or even knew that she was afraid, much less that they attempted to exploit her subjective fears to secure a confession.

Eubank's testimony was the product of her own free choice, not from any pressure or coercive tactics on the part of the agents.

### 3. February 26, 2014 interview

During her many friendly conversations with Agent Williams over the three-month period following the December 2 interview, Eubank provided additional incriminating evidence regarding Carl Swain, asked whether he had been apprehended, and expressed concern for her safety if he was released. *Id.* at 69-71. She also sought the agent's assistance in postponing her impending eviction from on-post housing, and she indicated that she had been visiting her mother in Florida and hoped to find her own accommodations there in the near future. *Id.* at 71. Eubank was also "calm [and] friendly" with the agents when they transported her to Savannah for her grand jury appearance on December 12, 2013. *Id.* at 77.

Aware that Eubank had packed her belongings in preparation for her move to Florida, Agent Williams telephoned her at 12:18 p.m. on February 26, 2014, and asked if the agents could speak with her before she left in order to tie up some loose ends. Tr. 79-80. Eubank agreed and drove her pickup truck to the CID building on Fort Stewart, arriving

there between 1:00 and 1:20 p.m. *Id.* at 80. Eubank's aunt rode with her and waited in the truck during the interview. *Id.*

Because of discrepancies between Eubank's initial FBI interview and her grand jury testimony, the agents strongly suspected that Eubank had either participated in her husband's murder or knew more than she was saying. *Id.* at 81-82. They therefore obtained the necessary approval to record the February 26 interview. *Id.* The Court has reviewed the recording of that two-hour, fifteen-minute interview, Gov't Ex. 4, as well as a transcript of the interview prepared by defense counsel. Doc. 243 (hereinafter "Feb. 26 Tr."). The government cites that transcript in its brief, disputing the accuracy of only a few of its passages. Doc. 174 at 16, nn. 4 & 5.

Agent Williams thanked Eubank for agreeing to come for another interview, asked about her lodging and transportation plans, and commented about her weight loss. Feb. 26 Tr. at 3-4. The agent stated "we'll make this quick, Lillie" and indicated that the agents just wanted "to clarify some things" and resolve "a couple of differences" between her December 2 interview and grand jury testimony. *Id.* at 4; *id.* at 5 (the agents wanted to "make sure that everything in their case file is as

complete and accurate as we can make it without extra questions coming from the attorney's office"). The agent offered to make tissue and water available to Eubank if she needed them. *Id.* at 4.

During initial questioning, Eubank simply rehashed some of the events immediately preceding her husband's death, once again assuring the agents that she "believed Carl's story about [clubbing] a pig." *Id.* at 29. Some thirty minutes into the interview, however, the agents informed Eubank that Carl Swain had provided "very detailed information" implicating both himself and Eubank in her husband's murder. *Id.* at 31-32. Agent Snider then stated that, as result of their two-and-one-half-month investigation, the agents now had "no doubt, no doubt whatsoever, that [she was] directly responsible for the circumstances that led to John's death." *Id.* Eubank responded that she never wanted her husband to die, "just . . . roughed up a little bit." *Id.* at 35. Despite the conversational, even gentle, nature of the questioning, Eubank began to cry, and she continued to do so for much of the remainder of the interview.[16] Agent Williams told Eubank to "calm down" and indicated that the faster the interview was completed, "the

---

[16] At times, Agent Williams lightly stroked Eubank's arm in an attempt to console her. Tr. (doc. 244) at 84.

faster you can get back to your mother; okay? You're going to get in your truck and ride and see your mom tonight." *Id.* at 44. Some three minutes later, Eubank admitted that Swain had demanded about $160,000 of the expected $400,000 life insurance proceeds. *Id.* at 47; *see id.* at 36. As the interview proceeded, Eubank conceded that she assisted Swain in acquiring the murder weapon, discussed the method for paying him his share of the insurance proceeds, and witnessed Swain beat her husband with a bat. *Id.* at 55. 57-59, 79-80, 91-92, 107.

Eubank then agreed to write a statement summarizing the new information she had just provided. *Id.* at 110. When she asked if she could go home after she wrote out her statement, Agent Snider responded "Yes ma'am. You'll go." *Id.* at 111. The agents asked about her plans to see a doctor and therapist the following day, and they again assured her that she could return to her mother's home in Florida. *Id.* at 115-16. Afterwards, Eubank introduced Agent Williams to her aunt and then departed in her truck. Tr. (doc 244) at 90. Before she left, she asked Agent Williams for another hug. *Id.* at 84.

The Court finds that this was a non-custodial interview. Eubank agreed to speak with the agents and drove herself to the CID office. The

agents thanked her for coming and stated "we'll make this quick." Eubank had been released at the conclusion of her prior two interviews and had every reason to believe that she would again be released. Even after the agents stated that they had "no doubt" about her guilt, they did not restrain her or imply that she was about to be arrested. As Eubank became more emotional, the agents reassured her that she would be travelling to see her mother that same day. While the agents certainly made clear that Eubank was a "prime suspect," such a statement is not "dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury v.* California, 511 U.S. 318, 325 (1994). Eubank was such a suspect. As Eubank has not shown that she was subjected to restraints on her freedom of movement of the degree associated with a formal arrest, *Miranda* warnings were not required.

The preponderance of the evidence also establishes that Eubank's confession was voluntary. The agents never threatened her with physical violence, browbeat her, or promised her any benefit for her cooperation (other than the assurance that they would make it known that she wasn't "solely responsible" for her husband's murder, Feb. 26

Tr. at 101). The agents were persistent in their questioning, but remained non-confrontational at all times. Eubank did not succumb to any abusive tactics, for none were employed. As her statements were not the result of police coercion, they were voluntarily given and, therefore, are admissible.

### 4. February 28, 2014 interview

After securing a warrant for Eubank's arrest, Agent Williams telephoned her on February 28, 2014 and asked her to come to the CID office to retrieve her camera. Tr. (doc. 244) at 92-93. Two agents met Eubank in the parking lot and escorted her inside to an interview room. *Id.* at 94. They did not place her in handcuffs. *Id.* Agent Williams stated that she had a warrant for her arrest, explained the basis for that warrant, and advised Eubank of her *Miranda* rights. *Id.* at 94-95. Eubank, who was calm and alert, waived her rights. *Id.* at 95-96; Gov't Ex. 20 (waiver-of-rights form signed by Eubank). The agent asked a single question, which Eubank freely answered. *Id.* at 95, 97-98. At the conclusion of the 10-minute interview, the agents placed Eubank in handcuffs and transported her to Savannah. *Id.* at 99.

Eubank's post-arrest statements are admissible, as they were made

after she had been given the *Miranda* warnings and were entirely voluntary.

**CONCLUSION**

The record refutes Eubank's claim that the interrogating agents violated her rights under *Miranda* or coerced a confession from her. Her motion to suppress her statements to those agents is therefore without merit and should be denied.

**SO REPORTED AND RECOMMENDED** this *18Th* day of March, 2015.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA